IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY N WEISS,<br><br>    Plaintiff,<br><br>    v.<br><br>AMERICAN ACADEMY OF OPHTHALMOLOGY, INC.,<br><br>    Defendant. | Case No. 20-cv-08124-CRB<br><br>**ORDER GRANTING MOTION TO DISMISS** |

Plaintiff Dr. Jeffrey Weiss, a Florida ophthalmologist, is suing Defendant American Academy of Ophthalmology, Inc. ("AAO"), a Minnesota not-for-profit corporation, of which he was formerly a member. Dr. Weiss alleges that AAO unlawfully investigated his conduct and terminated his membership.

The Court granted AAO's two prior motions to dismiss, holding that Dr. Weiss's claims were not ripe because AAO's Board of Trustees had not taken final action as to Dr. Weiss' membership. Dr. Weiss's second amended complaint alleges that AAO has now done so, and asserts violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and California Business and Professions Code section 17200, as well as breach of contract and violation of the common-law right of fair procedure. AAO has moved to dismiss for failure to state a claim for which relief may be granted. Having concluded that oral argument is unnecessary, the Court grants AAO's motion to dismiss. The Court denies Dr. Weiss leave to amend because amendment would be futile.

## I. BACKGROUND

### A. Facts

Dr. Weiss, a Florida resident, is an ophthalmologist and former member ("life fellow") of the AAO. See Second Amend. Compl. ("SAC") (dkt. 53) ¶ 3. AAO is a not-for-profit corporation organized under the laws of Minnesota. Id. ¶ 4.

AAO's governing documents include the Bylaws, which incorporate its Code of Ethics "to the same extent and with the same effect as though it were set forth verbatim." Id. ¶ 7. Part B of the Code of Ethics sets forth mandatory "Rules of Ethics." Id. ¶ 9; see Code of Ethics (dkt 53-2).[1] Part C of the Code sets forth "Administrative Procedures" that govern how the AAO handles alleged violations of these Rules. Id. ¶ 14.

The version of Rule 3 that was operative for all acts or omissions prior to 2020 stated:

> Research and innovation shall be approved by appropriate review mechanisms to protect patients from being subjected to or potentially affected by inappropriate, ill-considered, or fraudulent basic science or patient-oriented research. Basic science and clinical research are conducted to develop adequate information on which to base prognostic or therapeutic decisions or to determine etiology or pathogenesis, in circumstances in which insufficient information exists. Appropriate informed consent for research and innovative procedures must recognize their special nature and ramifications. In emerging areas of ophthalmic treatment where recognized guidelines do not exist, the ophthalmologist should exercise careful judgment and take appropriate precautions to safeguard patient welfare.

SAC ¶ 10.[2] Separately, federal law and Food and Drug Administration regulations require that programs funded by certain research grants be approved by Institutional Review Boards (IRBs), which "review biomedical and behavioral research involving human subjects." 42 U.S.C. § 289; 45 C.F.R. §§ 46.101-46.124.

At all times relevant here, Rule 13 has stated:
> Communications to the public must be accurate. They must not convey false, untrue, deceptive, or misleading information

---

[1] The Court considers the Code of Ethics because the amended complaint incorporates the Code of Ethics by reference. See Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 998 (9th Cir. 2018).
[2] In January 2020, Rule 3 was amended. See SAC ¶ 11. This amendment does not apply to this case because rule changes do not apply retroactively. Code of Ethics (dkt. 53-2) § (C)(2)(b).

2

> through statements, testimonials, photographs, graphics or other means. They must not omit material information without which the communications would be deceptive. Communications must not appeal to an individual's anxiety in an excessive or unfair way; and they must not create unjustified expectations of results. If communications refer to benefits or other attributes of ophthalmic procedures that involve significant risks, realistic assessments of their safety and efficacy must also be included, as well as the availability of alternatives and, where necessary to avoid deception, descriptions and/or assessments of the benefits or other attributes of those alternatives. Communications must not misrepresent an ophthalmologist's credentials, training, experience, or ability, and must not contain material claims of superiority that cannot be substantiated. If a communication results from payment by an ophthalmologist, this must be disclosed unless the nature, format or medium makes it apparent.

SAC ¶ 13.

When a violation of the Rules is alleged, the Ethics Committee investigates the member's actions or omissions "objectively, without prejudgment, and in confidence." Id. ¶¶ 14, 16; Code of Ethics (dkt. 53-2) § (C)(2)(c). The Committee determines whether the member "failed to observe the Rules of Ethics" and "recommend[s] an appropriate sanction to the Board of Trustees." SAC ¶ 14; see Code of Ethics § (C)(4)(a)–(c). The Board of Trustees then decides whether the member failed to observe the Rules and may impose a sanction. SAC ¶ 14; Code of Ethics § (C)(4)(c), (e). A member may then appeal a finding of non-observance to the organization's appellate body, which objectively reviews the facts found and the procedures followed. SAC ¶ 15; Code of Ethics § (C)(4)(f). The decision of the appellate body is binding on the Board of Trustees. Code of Ethics § (C)(4)(f).

In 2013 and 2015, Dr. Weiss designed two studies investigating "whether the isolation of autologous bone marrow derived stem cells . . . and the transfer of those cells to the eyes" could improve the visual function of patients with retinal and optic nerve eye disease or damage. SAC ¶¶ 18, 19, 24; see Study Protocols (dkt. 53, ex. 3). These studies, the "SCOTS Trials," were annually reviewed and approved by the International Cellular Medical Society's IRB. SAC ¶¶ 19, 20.

On July 24, 2017, the Ethics Committee asked Dr. Weiss ten questions about the

3

SCOTS Trials' "IRB approval, participation fees, and monitoring and reporting adverse results, among other general issues." Id. ¶ 24.  After Dr. Weiss responded, on December 19, 2017, the Ethics Committee informed him that it wished to review his research to assess his compliance with the Rules of Ethics, including Rules 3 and 13.  Id. ¶¶ 25–26. By the fall, the number of Dr. Weiss' research participants dropped, and he went from performing 28 procedures per month to 5 procedures per month.  Id. ¶ 27.

Dr. Weiss alleges that the Committee's investigation "became common knowledge in the medical community and even conveyed to Dr. Weiss's patients," in violation of its obligation to keep it confidential.  Id. ¶ 28.  Dr. Weiss alleges that Dr. Cherie Nau and Dr. Wendy Smith of the Mayo Clinic and Dr. Prem Subramanian of Johns Hopkins told patients and research participants "that the Academy was investigating Dr. Weiss's stem cell research."  Id.  He also states that "a number of [his] existing and prospective referral physicians, all members of Academy, improperly learned of the investigation, ceasing referrals."  Id. ¶ 29.

On May 1, 2018, the Committee began a "formal Challenge" into Dr. Weiss's compliance with the Code of Ethics.  Id. ¶ 30.  The Committee requested "raw data" and "data set analysis" relating to Dr. Weiss' publications, but he did not prepare or provide the requested data set analysis because he "never had an obligation to do so."  Id. ¶ 31. Instead, he produced redacted medical charts for all of the study participants, which he contends contained the relevant data.  Id.

On October 22, 2020, the Ethics Committee gave Dr. Weiss notice that it would hold a virtual hearing on "Dr. Weiss's alleged non-observance of Rules 3 and 13."  Id. ¶ 32.  Dr. Weiss "did not attend the hearing" because he believed it "was meant to legitimize the Committee's improper imposition of arbitrary standards to challenge" the SCOTS Trials and his published research results.  Id. ¶ 33.  The Committee concluded that "published research results were unsubstantiated in violation of Rule 13 and that the SCOTS Trials did not meet generally accepted standards for clinical research in violation of Rule 3."  Id. ¶ 32.

4

On February 18, 2021, the Ethics Committee recommended that the Board of Trustees "suspend Dr. Weiss's membership and ban him from sponsoring, presenting, or participating in any lecture, poster, film, instruction course, panel, or exhibit booth at any meeting or program offered by or sponsored by the Academy based on alleged non-observance." Id. ¶ 34. On February 22, 2021, the Board of Trustees "adopted the Committee's finding of nonobservance and terminated Dr. Weiss' membership due to the alleged violations of Rules 3 and 13." Id. ¶ 35.

On March 24, 2021, Dr. Weiss submitted to the Board a request for an appeal of the finding of non-observance and the proposed sanction. Id. ¶ 36. On June 12, the Academy's Appellate Panel affirmed the Board of Trustee's finding. Id. ¶ 37. The panel endorsed the Ethics Committee's conclusion that Dr. Weiss failed to comply with the standards of Rule 3 because "(a) his data was 'illegible' and 'poorly organized'; (b) he failed to report pre-existing conditions and complications as 'adverse events'; and (c) the IRB-approved research methodology was not sufficiently safe." Id. ¶ 38. It also endorsed the conclusion that he had violated Rule 13 because his publications "(a) 'contain[ed] false, untrue, deceptive, or misleading information and omitted material information without which the communications would be deceptive'; (b) 'appealed to understandable patient anxieties in an excessive or unfair way and unjustified expectations of results'; and (c) made 'claims relating to safety, efficacy, and success rates . . . not substantiated by the submitted patient data.'" Id. ¶ 39.

The AAO permanently terminated Dr. Weiss' membership on June 19, 2021. Id. ¶ 40.

**B.    Procedural History**

On November 18, 2020—before the Ethics Committee made any recommendation to the Board of Trustees—Dr. Weiss sued AAO, alleging that AAO was violating Dr. Weiss's "right of fair procedure" under California law. See Complaint (dkt. 1) at 11. On December 11, 2020, Dr. Weiss moved for a preliminary injunction. See Mot. for Injunction (dkt. 14). AAO moved to dismiss. See Mot. to Dismiss (dkt. 17).

5

On January 15, 2021, the Court denied Dr. Weiss's motion for a preliminary injunction and granted AAO's motion to dismiss. See First Order Granting MTD (dkt. 33) at 6–7. The Court concluded that it lacked jurisdiction over Dr. Weiss's right of fair procedure claim because he had not suffered a cognizable injury and thus lacked standing. Id. at 7. To the extent that Dr. Weiss had alleged concrete injury based on financial harm to his practice, Dr. Weiss had not asserted any cause of action based on that harm and had thus failed to state a claim for which relief could be granted. Id. at 8. The Court gave Dr. Weiss leave to amend. Id.

On February 22, 2021—after the Ethics Committee made its recommendation but before the Board of Trustees had taken any final action—Dr. Weiss filed his first amended complaint.[3] See First Amend. Compl. ("FAC") (dkt. 36). He asserted claims for breach of contract and violations of the FDUTPA and California Business and Professions Code section 17200. Id. ¶¶ 44–68. Dr. Weiss requested declaratory relief, an injunction, damages, restitution, and attorneys' fees. Id. at 15–17. AAO moved to dismiss for lack of subject matter jurisdiction and failure to state a claim for which relief may be granted. See Mot. to Dismiss FAC (dkt. 40).

The Court granted AAO's motion to dismiss. First, it explained that, because Dr. Weiss had not been sanctioned by the Board of Trustees, he had not suffered concrete harm because of the Ethics Committee's findings or recommendations. See Second Order Granting MTD (dkt. 50) at 8–9. Harm from the Board's possible sanction was too "hypothetical" to satisfy the Article III requirement of standing. Id. Second, while Dr. Weiss had pleaded financial harm because of AAO's alleged disclosure of the inquiry, he had "omitted any information regarding who at AAO ignored the rule, what was disclosed, when the prohibited disclosure occurred, how disclosure impacted patient referrals, or any other details." Id. at 10. Therefore, he had failed to "plead enough details to 'state a claim to relief that is plausible on its face.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678

---

[3] As noted above, the Board of Trustees actually did take action on the same day that Dr. Weiss filed his first amended complaint. See SAC ¶ 35.

1  (2009)).  Third, the Court noted that AAO had not violated the clear terms of Rules 3 or
2  13.  Rule 3 requires a doctor to "exercise careful judgment and take appropriate
3  precautions to safeguard patient welfare" in an "emerging area" where "recognized
4  guidelines do not exist." Id.; see SAC ¶ 10.  Contrary to Dr. Weiss' assertions, the rule
5  nowhere indicated that IRB approval satisfied these requirements.  Similarly, despite Dr.
6  Weiss' assertion to the contrary, Rule 13 applied to all "[c]ommunications to the public,"
7  including his noncommercial studies.  Second Order Granting MTD at 10–11.  The Court
8  granted Dr. Weiss leave to amend.  Id. at 11.

9      Dr. Weiss filed his second amended complaint on June 28, 2021, after the Board
10 had taken final action and the appellate body had affirmed the findings of the Ethics
11 Committee and the procedures it followed.  See SAC.  He again asserts two claims under
12 Florida and California law, respectively: one under the FDUTPA, and one under California
13 Business and Professions Code section 17200.  Id. ¶¶ 74–88.  He also asserts two
14 common-law claims: violation of the right of fair procedure and breach of contract.  Id. ¶¶
15 55–73.  Dr. Weiss requests equitable relief in the form of reinstatement of his membership
16 and an injunction, and legal relief in the form of damages.  Id. ¶ Prayer (a)-(g).

## II.   LEGAL STANDARD

18     Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint may be
19 dismissed for failure to state a claim upon which relief may be granted. Fed. R. Civ. P.
20 12(b)(6).  Rule 12(b)(6) applies when a complaint lacks either "a cognizable legal theory"
21 or "sufficient facts alleged" under such a theory.  Godecke v. Kinetic Concepts, Inc., 937
22 F.3d 1201, 1208 (9th Cir. 2019). Whether a complaint contains sufficient factual
23 allegations depends on whether it pleads enough facts to "state a claim to relief that is
24 plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic
25 Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff
26 pleads factual content that allows the court to draw the reasonable inference that the
27 defendant is liable for the misconduct alleged." Id. at 678.  When evaluating a motion to
28 dismiss, the Court "must presume all factual allegations of the complaint to be true and

7

1 draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los
2 Angeles, 828 F.2d 556, 561 (9th Cir. 1987). "[C]ourts must consider the complaint in its
3 entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6)
4 motions to dismiss, in particular, documents incorporated into the complaint by reference,
5 and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues &
6 Rights, Ltd., 551 U.S. 308, 322 (2007).

7       If a court dismisses a complaint for failure to state a claim, it should "freely give
8 leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). A court has
9 discretion to deny leave to amend due to "undue delay, bad faith or dilatory motive on the
10 part of the movant, repeated failure to cure deficiencies by amendment previously allowed,
11 undue prejudice to the opposing party by virtue of allowance of the amendment, [and]
12 futility of amendment." Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir.
13 2008).

## III. DISCUSSION

15       As a preliminary matter, the Court now has subject matter jurisdiction. Dr. Weiss
16 has alleged concrete injury because the Board of Trustees permanently terminated his
17 membership on June 19, 2021. See SAC ¶ 40. That injury is traceable to AAO's conduct
18 and would likely be redressed by a favorable decision. See Lujan v. Defenders of
19 Wildlife, 504 U.S. 555, 560–61 (1992).

20       Nonetheless, the Court dismisses Dr. Weiss' complaint for failure to state a claim.
21 First, Dr. Weiss' two claims under Florida and California law fail because, under
22 California's choice-of-law rules, only the law of the state of incorporation—here,
23 Minnesota—may apply to a corporation's internal affairs. Second, Dr. Weiss' request for
24 equitable relief—reinstatement or an injunction—is barred because Dr. Weiss failed to
25 comply with a procedural requirement in the Minnesota Nonprofit Corporation Act. Third,
26 Dr. Weiss' common-law right of fair procedure claim fails both because Minnesota does
27 not recognize this right and because he has not plausibly alleged any violation. Fourth, Dr.
28 Weiss' request for damages for breach of contract fails because Dr. Weiss still does not

8

allege that the AAO breached the bylaws. Because amendment would be futile, the Court denies leave to amend.

### A. Choice of Law

AAO argues that only Minnesota law can apply to Dr. Weiss' claims, as they concern affairs internal to a Minnesota corporation. Mot. to Dismiss (dkt. 55) at 6–8. Dr. Weiss argues that the so-called internal affairs doctrine does not apply. The Court agrees with AAO that this doctrine requires application of Minnesota law.

A federal court sitting in diversity applies the choice of law rules of the forum state. Mazza v. Am. Honda Motor Co., 666 F.3d 581, 589 (9th Cir. 2012). In California, the internal affairs doctrine "recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders." Vaughn v. LJ Internat., Inc., 174 Cal. App. 4th 213, 223 (2009) (quoting Edgar v. MITE Corp., 457 U.S. 624, 645 (1982)). California courts therefore generally apply the law of the state of incorporation to corporate acts such as "an issuance of shares, a payment of dividends, a charter amendment, or a consolidation or reorganization." State Farm Mut. Auto. Ins. Co. v. Superior Ct., 114 Cal. App. 4th 434, 443 (2003) (quoting Restatement (Second) of Conflict of Laws, § 302, cm. e (1971)).[4] Of course, the internal affairs doctrine does not apply to external corporate acts involving "the making of contracts, the commission of torts and the transfer of property." Lidow v. Superior Ct., 206 Cal. App. 4th 351, 359 (2012) (quoting Restatement (Second) of Conflict of Laws, § 302, cm. e). The internal affairs doctrine also applies to nonprofit organizations. Cf. Restatement of Charitable Nonprofit Orgs. § 5.04(c) ("Although the internal affairs doctrine developed

---

[4] California Corporations Code section 2116 partially codifies the internal affairs doctrine, as to liability of a corporation's directors for intrastate business. See Cal. Corp. Code § 2116 ("The directors of a foreign corporation transacting intrastate business are liable . . . for the making of unauthorized dividends, purchase of shares or distribution of assets or false certificates, reports or public notices or other violation of official duty according to any applicable laws of the state or place of incorporation."). That section does not apply here, as Dr. Weiss's complaint seeks to enjoin and hold the corporation liable rather than hold its directors liable. See SAC ¶ Prayer.

9

through cases involving for-profit entities and frequently applies to shareholder disputes that are irrelevant in the context of charities, virtually all jurisdictions have applied the doctrine to charities.").

Sometimes, "when vital statewide interests are at stake," California courts do not apply the internal affairs doctrine. Lidow, 206 Cal. App. 4th at 362. In Lidow, a California Court of Appeal held that the internal affairs doctrine did not govern a corporate board's removal of a CEO because the CEO's allegations of, inter alia, witness intimidation and physical threats to employees "[went] beyond internal governance and touche[d] upon broader public interest concerns." Id. Similarly, in Friese v. Superior Ct., 134 Cal. App. 4th 693, 698 (2005), as modified (Jan. 24, 2006), a Court of Appeal held that the doctrine did not apply to insider trading claims because California's corporate securities laws have broad policy purposes beyond internal governance. In both cases, the court emphasized that the relevant corporation's principal place of business was in California. Friese, 134 Cal. App. 4th at 697; Lidow, 206 Cal. App. 4th at 354; see also W. Air Lines, Inc. v. Sobieski, 191 Cal. App. 2d 399, 412 (1961).

AAO argues that "determinations related to qualifications for membership and the standards for suspension or termination" are internal affairs covered by the doctrine. Mot. at 7–8. It notes that Dr. Weiss' claims all turn on "alleged ultra vires actions of Ethics Committee, Board, and Appellate Panel members, in their official capacity performing Academy duties." Mot. at 7. AAO emphasizes that the rationale for the internal affairs doctrine is that a corporation should have consistency as to which state's law applies to its membership rules, especially because jurisdictions have distinct laws. Compare Minn. Stat. § 317A.411(1), (2) (a "fair and reasonable" termination procedure requires 15 days' prior notice of the reasons for termination), and Cal. Corp. Code § 7341(b), (c)(2) (similar), with Fla. Stat. Ann. § 617.0607 (imposing no time requirement on notice for a "fair and reasonable" termination). AAO has 32,000 members, 71% of whom live in the United States. SAC ¶ 6. If the internal affairs doctrine did not apply, "the Academy could be subject to any state's laws." Mot. at 8.

10

Dr. Weiss contends that the internal affairs doctrine does not apply because his individual claims do not concern "a distribution, a charter amendment, or similar acts of corporate governance that warrant application of the internal affairs doctrine." Opp. at 8. Dr. Weiss further contends that AAO would not be subject to conflicting demands in different states because the law is similar in different jurisdictions. Id. However, he then acknowledges that state laws differ: a Minnesota statute bars equitable claims against nonprofit corporations unless they are brought "by at least 50 members with voting rights or ten percent of the members with voting rights, whichever is less." Minn. Stat. § 317A.467. He insists that applying the internal affairs doctrine "would subvert fundamental policy objectives of California and Florida, who [sic] have a materially greater interest in protecting their residents and applying [their] laws to business headquartered and transacting most of their business within these states." Opp. at 8.

The internal affairs doctrine applies here. The Court acknowledges that California cases applying the internal affairs doctrine typically arise in the for-profit context. See, e.g., Vaughn, 174 Cal. App. 4th at 223 (derivative suit); State Farm, 114 Cal. App. 4th at 446 (corporate board's decision to declare dividends). Yet the doctrine also applies to nonprofit organizations. Cf. Restatement of Charitable Nonprofit Orgs. § 5.04(c). Dr. Weiss' allegations clearly concern AAO's internal affairs. Dr. Weiss alleges that he was a member of the AAO until it investigated him and terminated his membership in violation of its bylaws. SAC ¶¶ 3, 24–40, 67–72. But, even if the bylaws constitute a contract, it is one internal to the AAO. Cf. Lidow, 206 Cal. App. 4th at 359. Dr. Weiss nowhere alleges that he made any external contract with the AAO, nor does he allege a property dispute with or the commission of a tort by the organization.

California lacks a public policy justification for overriding the internal affairs doctrine and exercising its own law, much less Florida's law. Dr. Weiss states in his complaint that the AAO's arbitrary actions toward him are "against public policy" because they will have "deleterious consequences . . . in scientific advancements and research." SAC ¶ 51. Yet Dr. Weiss' claims do not implicate any public policy concern nearly as

11

1  compelling as the allegations of witness intimidation and physical threats in Lidow. Nor is
2  this case like Friese, where California statutes concerning insider trading overrode the
3  internal affairs doctrine. Dr. Weiss points to no California statute or case that elevates the
4  promotion of scientific research to a public policy issue justifying internal regulation of
5  foreign corporations. And the mere fact that a procedural requirement in Minnesota may
6  bar Dr. Weiss from some (or all) of his claims does not provide a public policy basis to
7  override the doctrine.
8  The Court therefore holds that only Minnesota law may apply to Dr. Weiss' claims.

### B.  Florida and California Claims

Claims 3 and 4 derive from statutes in Florida and California, respectively. Because these states' laws cannot apply, Dr. Weiss' claims under the FDUTPA and California Business and Professions Code section 17200 are dismissed for failure to state a claim. See Godecke, 937 F.3d at 1208.[5]

### C.  Minnesota Claims

#### 1.  Equitable Relief

In the Minnesota Nonprofit Corporation Act, Minn. Stat. §§ 317A.001-909, the Minnesota legislature set out rules governing many issues related to nonprofit governance, including the incorporation and amendment of the charter, limitations on ultra vires activities, members' rights and liabilities, and due process protections regarding membership. The legislature also included a procedural requirement that permits equitable claims against nonprofit corporations "for violation of this chapter" only when they are brought "by at least 50 members with voting rights or ten percent of the members with voting rights, whichever is less." Minn. Stat. § 317A.467.

Minnesota Statute § 317A.467 bars Dr. Weiss' requests for equitable relief. See SAC ¶ Prayer (a)-(g) (requesting reinstatement of his membership and an injunction). In

---

[5] For the same reasons, Dr. Weiss' prayer for attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5 and Florida Statutes §§ 501.2105 and 501.211 are dismissed as moot. SAC ¶¶ 54, Prayer (f)-(g).

Jensen v. Duluth Area YMCA, 688 N.W.2d 574, 576 (Minn. Ct. App. 2004), the YMCA terminated John Jensen's membership one day after he allegedly pushed several children on the running track.  Minnesota law provides that membership in a nonprofit corporation may not be terminated "except pursuant to a procedure that is fair and reasonable," which was defined to require "15 days' of prior notice."  Minn. Stat. § 317A.411.  However, the court affirmed a grant of summary judgment to the YMCA on Jensen's claim for reinstatement because it was an equitable claim not brought "by at least 50 members with voting rights or ten percent of the members with voting rights."  Minn. Stat. § 317A.467.  The court rejected Jensen's argument that it was "absurd" to apply § 317A.467 to individual claims arising from wrongful termination.  Jensen, 688 N.W.2d at 577–78.  It emphasized the provision's clear text, as well as the general comment to the act stating that the procedural rule was "intended to be high enough to prevent frivolous actions that drain potentially limited resources of nonprofit corporations, while still allowing a minority of members to act."  Id. (quoting Minn. Stat. § 317A.165 gen. cmt.).  Of course, § 317A.467 did not apply to Jensen's breach of contract claim because he requested the legal remedy of damages.  Id. at 578–79.

Notwithstanding Jensen, Dr. Weiss argues that section 317A.467 can only "logically" apply to derivative actions, and that it must be so interpreted to avoid "absurd" results.  Opp. at 10.  But Jensen considered, and rejected, this argument.  Dr. Weiss cites a case that reached the opposite holding in interpreting a similar provision in North Dakota's Nonprofit Corporations Act.  Id. (quoting Marhula v. Grand Forks Curling Club, Inc., 863 N.W.2d 503 (N.D. 2015)).  North Dakota law has no relevance here.

To the extent that he requests reinstatement of his membership or an injunction, Dr. Weiss' claims fail.

### 2.     Right to Fair Procedure

Dr. Weiss' common-law right to fair procedure claim fails because that right does not exist in Minnesota.  Even if it did, AAO complied with it.

Dr. Weiss cites two Minnesota cases in support of this purported right.  See Opp. at

13

10. In Peters v. Minnesota Dep't of Ladies of Grand Army of Republic, 58 N.W.2d 58, 60 (Minn. 1953), the Minnesota Supreme Court stated that "members of nonprofit associations enjoy certain rights which will be protected by equity and among them is that of notice and hearing before expulsion." In Benson Co-op. Creamery Ass'n v. First Dist. Ass'n, 170 N.W.2d 425, 427 (Minn. 1969), the court explained that, before membership in a cooperative could be terminated, "[i]t must first be demonstrated that the member has violated a rule or policy of the association adopted by its members."

But Peters and Benson do not establish a right to fair procedure for two reasons. First, neither of these cases has been cited in a published opinion in almost forty years. It was not mentioned once in Jensen, which concerned allegedly insufficient procedure in the termination of membership in a nonprofit. See 688 N.W.2d 574. If this common-law right existed, it has fallen into desuetude. Second, Peters states that the alleged right is protected "by equity" and that a successful plaintiff would be "entitled to reinstatement." 58 N.W.2d at 60. But, as noted above, Minnesota Statute § 317A.467, which postdates these cases,[6] imposes a prerequisite to obtaining equitable relief. Dr. Weiss did not satisfy this prerequisite, and he cannot evade § 317A.467 merely by framing his claim as a common-law one. Cf. Minn. Stat. § 317A.165 gen. cmt. (stating that the legislature intended this requirement "to prevent frivolous actions that drain potentially limited resources of nonprofit corporations").

Even if a right to fair procedure exists in Minnesota and relief could be granted, AAO satisfied its obligations. Peters and Benson suggest that Minnesota law requires only (1) that the organization provide a "notice and hearing before expulsion" and (2) that the organization "demonstrate[] that the member violated a rule or policy." Peters, 58 N.W.2d at 60; Benson, 170 N.W.2d at 427. The notice and hearing need only satisfy "minimum requirements of fairness," and these protections "need not . . . [be] the same . . . [as those] guaranteed under the [organization's] formal procedure." Peters, 58 N.W.2d at 60.

---

[6] The current version of the Minnesota Nonprofit Corporation Act dates to 1989. See Minn. Stat. § 317A.001 (eds. note).

In fact, AAO offered Dr. Weiss more than two years of procedures. In December 2017, the Committee informed him that it wished to review his research. SAC ¶¶ 25–26. The formal challenge began in May 2018. Id. ¶ 30. Dr. Weiss received notice of a hearing in October 2020. Id. ¶ 32. (In a prior complaint, Dr. Weiss stated that this hearing occurred on November 21, 2020. See FAC ¶ 36.) The Committee found that Dr. Weiss "violated a rule or policy" in February 2021. SAC ¶ 34. After the Board of Trustees adopted this finding, it was affirmed by the AAO's appellate panel. Id. ¶¶ 35, 37–39.[7]

Dr. Weiss does not state a claim for violation of the right of fair procedure.

### 3. Breach of Contract

Dr. Weiss does not state a claim for breach of contract because he does not plausibly allege that the AAO misapplied Rules 3 and 13, breached its obligation to be objective, or failed to keep the investigation in confidence. As before, the Court will assume that a failure to adhere to a provision in the Code of Ethics could constitute a breach of contract. See Second Order Granting MTD at 10.

#### a. Rules 3 and 13

In its last order granting AAO's motion to dismiss, this Court explained:

> Dr. Weiss argues that AAO breached the Code of Ethics by asserting that Dr. Weiss violated (i) Rule 3, despite his studies having IRB approval, and (ii) Rule 13, although that rule does not apply to his noncommercial speech. See Opp. (dkt. 48) at 9. But the Rules show that these arguments are meritless. IRB approval would not foreclose an investigation under the operative version of Rule 3. In addition to requiring "appropriate review mechanisms," Rule 3 unambiguously required ophthalmologists to provide study participants with certain information and to "exercise careful judgment and take appropriate precautions to safeguard patient welfare" when performing research in "emerging areas . . . where recognized guidelines do not exist." Amend. Compl. ¶ 13. Thus, an IRB-approved study could still violate Rule 3. Similarly, Rule 13 applies to all "[c]ommunications to the public," such that even noncommercial communications could violate Rule 13. Id. ¶ 16.

---

[7] Notably, Dr. Weiss refused to avail himself of many of the procedures he was offered. Dr. Weiss did not produce the "data set analysis" that the Ethics Committee requested. Id. ¶ 31. And when the Committee held its hearing, he refused to attend. Id. ¶ 33.

15

Id. at 10–11.

Though Dr. Weiss has included additional allegations, he still does not state a claim. Dr. Weiss states that the Committee's conclusions that he violated Rules 3 and 13 were "unsupported" because the Committee did not "review[] the records adequately" and that it "misclassified" the adverse events it found. Id. ¶¶ 42, 47, 50. Yet Dr. Weiss failed to provide his data in the form requested by the Ethics Committee, so he bears responsibility for any alleged errors in interpreting it. Id. ¶ 31. Contrary to Dr. Weiss' argument, the Committee's finding that his data was "illegible" and "poorly organized" supported the conclusion that he violated Rules 3 and 13. The fact that Dr. Weiss maintained illegible records suggests that he did not "exercise careful judgment and take appropriate precautions to safeguard patient welfare" as Rule 3 requires. Id. ¶¶ 10, 39. It also suggests that Dr. Weiss' research cannot be substantiated and that his communications therefore contained "false" or "misleading" information in violation of Rule 13. Id. ¶ 13. Though the rules do not mandate "specific record-keeping standards," a record-keeping practice that is not specifically prohibited may demonstrate a violation of these rules. Id. ¶¶ 47, 10.[8]

In addition to his earlier claims as to breach, Dr. Weiss now argues that the Committee violated its obligation to conduct its investigation "objectively and without prejudgment." See Code of Ethics § (C)(2)(c); SAC ¶¶ 16, 44. But this new claim is vague and conclusory, and in substance it largely repeats his previous argument that IRB-

---

[8] Dr. Weiss complains that the Rules are "vague," but does not explain why this is legally significant. SAC ¶ 46. And if Dr. Weiss intended to argue for a better interpretation of the phrases "careful judgment" and "appropriate precautions" as applied to his own research, he could have attended his hearing in front of the Ethics Committee and done so.
   Dr. Weiss also claims that the AAO's interpretation and enforcement of Rules 3 and 13 is "against the weight of public policy." Id. ¶ 48, 51. His policy arguments appear to have no legal relevance, but even if they did, he is mistaken. Federal law does not make IRBs the final arbiters of all ethical questions in medical science; it only provides that they decide ethical acceptability of programs funded by certain research grants. See 42 U.S.C. § 289. And it seems doubtful that the AAO's reasonable interpretation of Rule 13—that communications with the public must be accurate and substantiated by legible data sets—will chill legitimate research.

16

approved research can never violate Rule 3. Id. ¶ 44; see also Opp. at 14–15.[9] Dr. Weiss makes no plausible allegations that the investigation was anything but objective.

### b. Breach of Confidentiality

Dr. Weiss' final allegation is that the AAO breached its bylaws by failing to conduct its investigation "in confidence." Id. ¶ 16; Code of Ethics § (C)(2)(c). Previously, the Court dismissed this claim because Dr. Weiss had "omitted any information regarding who at AAO ignored the rule, what was disclosed, when the prohibited disclosure occurred, how disclosure impacted patient referrals, or any other details." Second Order Granting MTD at 10.

Dr. Weiss still does not state a plausible claim. He now alleges that Dr. Cherie Nau and Dr. Wendy Smith of the Mayo Clinic and Dr. Prem Subramanian of Johns Hopkins told patients and research participants "that the Academy was investigating Dr. Weiss's stem cell research." Id. ¶ 28. But Dr. Weiss still fails to allege "who at AAO ignored the rule" because he does not plead basic facts such as whether these doctors are AAO members, whether they were involved in the ethics investigation, or how they otherwise knew about it. Id. He thus does not plead that the disclosure resulted from AAO's failure to conduct the investigation "in confidence." And because he fails to state in his complaint "when the prohibited disclosure[s] occurred," he has not pleaded that the harm he suffered came about after and because of the disclosures. His claim that other doctors ceased referrals because of the disclosure is vague and conclusory. Id. ¶ 29. Having failed to add necessary facts, Dr. Weiss still does not state a claim.

## IV. CONCLUSION

The Court has twice given Dr. Weiss leave to amend his complaint. In its last

---

[9] On this point, Dr. Weiss again cites two sources that were in his previous complaint and that remain unpersuasive. First, he cites advisory opinions suggesting that IRBs are "appropriate review mechanisms" under Rule 3. SAC ¶ 43. But even if these opinions were binding, they would not insulate Dr. Weiss from the rest of the rule. Next, he cites a 2020 Amendment to Rule 3 that explicitly states that IRB approval is an "appropriate review mechanism." Id. ¶ 11. But the new rule is not applicable to the events in this case, and, although the new rule requires IRB approval, it still does not provide a safe harbor for all IRB-approved research.

17

order, the Court specified the additional facts Dr. Weiss must plead to state a viable claim for breach.  Because Dr. Weiss has not done so, the Court concludes that amendment is futile.  <u>Leadsinger</u>, 512 F.3d at 532.  For the foregoing reasons, the Court grants the motion to dismiss without leave to amend.

**IT IS SO ORDERED.**

Dated: October 13, 2021



CHARLES R. BREYER
United States District Judge

18